UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TRUSTEES OF MICHIGAN REGIONAL
COUNCIL OF CARPENTERS EMPLOYEE
BENEFITS FUND, MICHIGAN REGIONAL          Case No. 10-cv-14042
COUNCIL OF CARPENTERS ANNUITY FUND,
CARPENTERS PENSION TRUST FUND-DETROIT      Paul D. Borman
AND VICINITY, DETROIT CARPENTRY JOINT      United States District Judge
APPRENTICESHIP AND TRAINING FUND,
HEALTH AND WELFARE FUND, and               Mark A. Randon
CARPENTERS SUPPLEMENTAL BENEFITS FUND,     United State Magistrate Judge

                          Plaintiffs,
v.

EXHIBIT WORKS, INC., a Michigan corporation,
d/b/a EWI WORLDWIDE,
                          Defendants.
_____/

OPINION AND ORDER
(1) DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 35);
(2)  GRANTING DEFENDANT EXHIBIT WORKS, INC.'S
MOTION FOR SUMMARY JUDGMENT (DKT. NO. 36); and
(3) DENYING PLAINTIFFS' MOTION TO FILE AN AMENDMENT
TO THE COMPLAINT (DKT. NO. 34)

This matter is before the Court on the parties' cross motions for summary judgment.  (Dkt.

Nos. 35, 36.)  Both parties filed responses (Dkt. Nos. 38, 39) and replies (Dkt. Nos. 42, 43.)  The

court held a hearing on April 4, 2012.  For the reasons that follow, the Court DENIES Plaintiffs'

motion for summary judgment, GRANTS Defendant's motion for summary judgment and DENIES

Plaintiffs' motion to file a nominal amendment to their Complaint.

**INTRODUCTION**

In this breach of contract action, the Trustees of Michigan Regional Council of Carpenters

Employee Benefits Fund, Michigan Regional Council of Carpenters Annuity Fund, Carpenters

1

Pension Trust Fund-Detroit and Vicinity, Detroit Carpentry Joint Apprenticeship and Training Fund, Health and Welfare Fund, and Carpenters Supplemental Benefits Fund ("Plaintiffs" or "the Plaintiff Benefit Funds"), seek to compel Exhibit Works, Inc. d/b/a EWI Worldwide ("EWI"), an employer and party to a Collective Bargaining Agreement ("CBA") between the Michigan Exhibit Producers Association and Independent Contractors ("MEPA") and the Michigan Regional Council of Carpenters, United Brotherhood of Carpenters and Joiners of America, AFL-CIO ("MRCC"), to submit to an audit and to produce certain records in connection with a requested payroll audit to confirm the amount of EWI's employee benefit contributions to the Plaintiff Benefit Funds. Plaintiffs' one-count Complaint claims that EWI has breached the CBA by refusing to provide the requested records. Plaintiffs seek an order compelling EWI to "open its books and records" and also ask the Court to award judgment to Plaintiffs in the amount of any unpaid contributions (including interest, attorneys fees and costs) discovered following review of the requested records.

EWI objects to the scope of the audit as defined by Plaintiffs, arguing that Plaintiffs are not entitled to examine any payroll or wage related records that pertain to individuals employed by, and work performed at, any of EWI's facilities that are not covered by the parties' CBA. EWI further responds that Plaintiffs are not entitled to examine EWI's "work orders," which EWI asserts have never been classified as payroll or wage related records and do not contain any information relating to payroll or wages. EWI also argues that the request to examine these records is made for an improper purpose, specifically to further the goals of the MRCC, and not for the benefit of covered plan participants and beneficiaries. EWI seeks dismissal of Plaintiffs' Complaint with prejudice.

The Court concludes that Plaintiffs are not entitled to review the payroll and wage related records of employees who are employed and doing work outside the geographic jurisdiction of the

CBA, who by definition are not covered by the CBA. Plaintiffs have not demonstrated that EWI has the potential to owe contributions on work being performed by such individuals. In the absence of the potential that a review of the records of concededly non-covered employees might unearth an unidentified plan participant, or disclose the existence of "covered work" for which no contributions have been made, such records have no relevance to the requested audit and the Court refuses to order that EWI grant Plaintiffs access to such records. Further, without a greater showing that the requested "work orders," documents that Plaintiffs have never requested in connection with any prior audit of EWI or of any other member company, bear some relevance to the determination of potential unpaid employee benefit contributions, the Court refuses to order that EWI grant Plaintiffs access to its "work orders." Finally, Plaintiffs have not established that, even if relevant, the requested "work orders" are payroll or wage related records as defined by the relevant Plan and Trust documents.

Accordingly, the Court DENIES Plaintiffs' motion for summary judgment, GRANTS Defendants' motion for summary judgment and DENIES Plaintiffs' motion to file a nominal amendment to the Complaint.

## I.    BACKGROUND

### A.    EWI's Obligations to Make Contributions to the Plaintiff Funds on Work Covered by the CBA and Plaintiffs' Audit Rights Under the Plan and Trust Documents

EWI is engaged in the business of designing, fabricating and managing exhibits for its clients worldwide. (Dkt. No. 36, Def.'s Mot. Ex. 1, Dec. 16, 2011 Affidavit of Michael Lockard ¶ 2.) The majority of EWI's business comes from clients in the automotive industry. *Id*. at ¶ 4. As a result of various negative economic conditions, from 2008 to 2010, EWI experienced a 40% decrease in

its annual revenue. *Id.*

EWI fabricates some of its exhibits at its Livonia, Michigan facility. *Id.* at ¶ 5. In connection with the work done at its Livonia facility, EWI is a party to the CBA between MEPA and MRCC. (Def.'s Mot. Ex 2, 2008-2011 Carpenters Display Agreement between MEPA and MRCC.) The jurisdiction of the CBA is limited both geographically (the CBA covers the following Michigan counties: Wayne, Oakland, Macomb, Sanilac, St. Clair, Monroe, Washtenaw and Livingston) and by craft (layout, fabrication, assembling and erection of displays made of wood, metal, plastic, composition board, or any substitute material . . . the crating and uncrating, the handling from point of unloading and back to point of loading, of all displays). (*Id.* at 1, 2.) Thus, whether an employee is covered by the CBA depends on both where the employee performs work and what work the employee performs. Under the CBA, the MRCC (or the "Union") is recognized as the collective bargaining agent for all persons employed in the craft in the geographical eight-county area coming within the jurisdiction of the CBA. (*Id.* at 1.) Under the CBA, EWI has agreed to make certain contributions to the Plaintiff Benefit Funds. (*Id.* at 21-24.) Each Fringe Benefit Contribution required to be made by an employer such as EWI under the CBA is defined and calculated based upon "hours worked by each Employee covered by [the CBA]." *Id.*

The CBA incorporates by reference the Plan and Trust documents of each Fringe Benefit Fund named in the CBA. (*Id.* at 23-24.) Several of the Plan and Trust documents give Plaintiff Trustees rights to audit an employer's payroll and related records to assure that timely and complete contributions are being made to the Funds for all work covered under the terms of the CBA. (*See, e.g.* Def.'s Mot. Ex. 9, Carpenters Pension Trust Fund Agreement § 13; Ex. 12, Detroit Carpentry Joint Apprenticeship and Training Trust Fund § 5.13.) Also incorporated into the CBA by reference

is the Detroit Carpenters Fringe Benefit Funds Statement of Delinquent Employer Collection Policies and Procedures ("Statement of Collection Policies"), pursuant to which the Joint Delinquency Committee ("JDC") functions as the "collection agent" for the Plaintiff Funds in collecting delinquent employer contributions. (Def.'s Mot. Ex. 13.) The Statement of Collection Policies "supplements the Plan, Trust or any other governing documents of each Fund and is not intended to amend or restate same. If any portion of th[] Statement conflicts with that of the applicable governing documents, the provisions of the respective governing documents shall control." (*Id. at* Preamble.) In addition to authorizing the JDC to take various actions to collect delinquent employer contributions, the Statement of Collection Policies establishes an Audit Program which seeks "to audit each Employer's books and records at least once in any three-year period, in order to verify compliance with the terms and conditions of the collective bargaining agreement and the Plan and Trust documents." (*Id.* at ¶ 4.) The Statement of Collection Policies further provides:

> On written demand, each Employer shall promptly make available to the Funds' auditors any and all Employee wage and related records for an audit. Each employer shall also render to the JDC, with the payment of contributions, or at such other regular intervals as the JDC may request, written contribution reports indicating its Employees' names, social security numbers, hours worked, wage earnings and the amount of contributions to the Funds and such other information as the JDC may require. The JDC, or its authorized representatives, will examine and audit the pertinent payroll or any other relevant books and records of each Employer whenever such examination may be deemed necessary or advisable by the JDC in connection with proper administration of the Funds.

*Id.*

EWI has never been found to be delinquent in its benefit fund contributions.[1]  EWI was

---

[1] EWI suggests that the JDC is inapplicable because EWI has never been, and is not now, delinquent on its contributions. The Court need not address this issue given its resolution of the issues *infra*.

audited in 2007 and 2008 and received letters from Plaintiffs' auditors indicating that EWI's

contributions for the relevant periods had been properly made. (Def.'s Mot. Ex. 30.) On October

12, 2009, Plaintiffs initiated another routine audit of EWI, requesting examination of the usual

payroll and related records:

- Employee earning records by calendar year, showing each employee's name, address, social security number, occupation, straight time and overtime hours worked, rate of pay, gross earnings, all deductions and net pay.
- W-2 form filed for each employee annually.
- W-3 form filed for each year.
- Current year M.E.S.C. Form 1017 (employees quarterly wage detail report)
- 1099's issued annually.
- 1096 form filed for each year.

(Def.'s Mot. Ex. 14.) On November 19, 2009, EWI received a letter from Plaintiffs' auditors

indicating that once again the examination of EWI's relevant books and records revealed that

contributions had been properly made for the period 1/07-9/09. (Def.'s Mot. Ex. 15.)

## B. The February 8, 2010 Special Audit Request

For reasons that remain unclear but that are at the heart of this lawsuit, on February 8, 2010,

Plaintiffs initiated a special, non-systematic audit of EWI. (Def.'s Mot. Ex. 20.) In addition to

asking to re-examine all of the records that EWI had previously submitted, the February 8, 2010

special audit request asked for the following additional documents, stating that the newly-requested

documents were "not available at the time [the November, 2009] audit was performed." *Id*. In

relevant part, the February 8, 2010 audit request stated:

> Further, it is our understanding that EWI has a facility in North Carolina that has or may have done work covered by the applicable Collective Bargaining Agreement. To make sure that all appropriate contributions have been paid, please provide the above information for all employees of the North Carolina facility, as well. Further, please provide all work orders for 2008 and 2009. Please provide documentation of the man hours for each of the work orders and location of the facility for which the work was done.

*Id.* In a subsequent email, Plaintiffs' counsel requested work orders, man hours for each work order and location of the facility where the work was done, for the year 2007 in addition to the years 2008 and 2009. (Def.'s Mot. Ex. 24, p. 4, May 10, 2010 email from David J. Selwocki to Edward C. Hammond.) The February 8, 2010 letter referred to EWI's North Carolina non-union facility and apparently requested information from all of EWI's facilities, which, in addition to Livonia and North Carolina, are located in Georgia, Illinois, Wisconsin, China and Germany (among others). (Def.'s Mot. Ex. 1, Lockard Aff. ¶ 6.)

Richard Davis, the President of the MRCC and Pension Trust Chairman, testified at his deposition that the February 8, 2010 audit request was aimed at determining whether all of the work performed by EWI in Michigan "was being performed at EWI's facility . . . ." (Def.'s Mot. Ex. 5, July 27, 2011 Deposition of Richard Davis, 18:1-4.) Mr. Davis expressed concern that there had been a significant drop in the total hours reported by EWI to the MRCC and Plaintiffs wanted to know "where the hours are because they're certainly not in Michigan." *Id.* 18:5-19: 7. EWI reported 221,464 hours for the 2007 calendar year, 219,328.75 for 2008, 138,329.00 for 2009, and 116,139.75 for 2010. (Dkt. No. 35, Pl.'s Mot. Summ. Judg. Ex. B.) Through the first five months of 2011, 46,146.25 hours were reported. *Id.* A comparison of the decrease in hours reported by EWI to the MRCC during those years to the total decrease in hours reported by other companies during the same period of time shows that EWI's contributions decreased by approximately 33.1% while the total decrease in contributions by other employers was down by approximately 39.89%. (Def.'s Reply, Ex. 2, March 23, 2011 Memorandum from Kim Vaughn to Rich Davis, Annual Analysis of Hours Worked.)

Mr. Davis testified that he was concerned that "various display contractors were

subcontracting work to non-union owned entities, out of the State of Michigan," and that there may have been active members of the MRCC or retirees who were working out of state for whom contributions had not been paid. (Def.'s Mot. Ex. 5, Davis Dep. 18:1-19:23; Ex. 21, JDC Minutes; Ex. 22, Audit Letter with Notation "Requested by Richard Davis".) Mr. Davis also testified that he had been told by his foreman, David Sperry, and had received anonymous phone calls indicating, that EWI's Chairman and CEO, Dominic Silvio, stated that he was going to be "backing off on hours because of his pension liability." (Def.'s Mot. Ex. 5, Davis Dep. 18:9-25.) David Sperry also indicated in an affidavit that he had been told by Mr. Silvio directly, in August, 2009, that Mr. Silvio had "educated himself regarding the underfunded pension liability" and that "he could send out 70% of the work and retain 30%, without having withdrawal liability," and "that there was nothing the Union could do about it." (Pl.'s Mot. Ex. D, August 4, 2011 Affidavit of David Sperry ¶ 4.)

The parties do not dispute that the CBA does not prohibit EWI from operating facilities outside Michigan and there is no question that the CBA does not contain a work preservation clause that would prohibit EWI from assigning work outside Michigan. (Def.'s Mot. Ex. 2, CBA, Article XIV, p. 33; Ex. 1, Lockard Aff. ¶ 7.) In late 2008 and early 2009, EWI informed the MRCC that it was considering moving work outside the jurisdiction of the MRCC because it was facing financial hardship, in part due to increased labor costs, and encouraged the Union to contact EWI to discuss its decision. (Def.'s Mot. Ex. 4, November, 2008 and March, 2009 letters.) Plaintiffs have expressly acknowledged that they were aware in early 2009 that EWI was operating a non-union facility outside of Michigan 2009. Richard Davis testified in his deposition that he knew at the time he became President of the MRCC in 2009, that EWI was operating outside the State of Michigan. Davis testified that in July or August, 2009, he met with Mr. Silvio, EWI's Chairman and

CEO, in an effort to "get back into a better working relationship" with EWI. Mr. Davis testified that at that meeting back July or August of 2009, he tried to convince Mr. Silvio to move some "man hours" into Detroit. (Def.'s Mot. Ex. 5, Davis Dep. 10:14-23.) Mr. Davis testified that Mr. Silvio responded that "it was too late" because "decisions had been made." (*Id*. 10:23-25.) When asked specifically if he was aware, at that time, of EWI's North Carolina operation, Davis responded that yes, he was aware of it. (*Id*. 11:8-10.)

In an August 18, 2011 hearing on a motion to compel in this matter, Magistrate Judge Randon confirmed that EWI was free, under the CBA, to perform work at non-union facilities outside the jurisdiction of the CBA and that Plaintiffs had no audit rights with respect to such work:

> The Court: All right. Now, if the company decided to send work from its operations in Michigan that is covered work, to this plant or whatever operation in North Carolina, would that be a violation of the collective bargaining agreement?
>
> Counsel: In my opinion, it would be, Your Honor, depending on if this is work that is traditionally done here and they did it to evade the contract obligations. It's kind of under the theory of just if you did it across the street with a rat crew, what's the difference if you step across the border. It's the same argument. But before I can really analyze that, I have to find out the facts. We're right now assuming that the work all went to North Carolina.
>
> \*                  \*                  \*
>
> The Court: Well, the reason I asked the question is because if it's not – if it can't be a violation of the contract to move the work to this non-union plant in North Carolina, then you don't have a right to get any information regarding the plant. Doesn't that make sense?
>
> Counsel: It certainly does, Your Honor. If you are not entitled to the hours for that work, then why would you need the payroll or any information regarding those hours? And that's why we pared down our discovery request and our initial audit request . . .
>
> The Court: So you're not asking for anything from this plant in North Carolina,

<div style="margin-left:3em">

from this . . .

Counsel:     No, Your Honor.

</div>

(Dkt. No. 43, Def.'s Reply, Ex. 4, Transcript of Aug. 18, 2011 Hearing, 5-7.)  Notably, in its May, 2011 CBA negotiations, the MRCC attempted to introduce a work preservation provision that would prohibit assigning work outside the jurisdiction of the CBA and also proposed further restrictions on an Employer's ability to subcontract out work, none of which is prohibited under Article XIV of the current CBA.  (Def.'s Mot. Ex. 29, May 2, 2011 Union's Negotiation Proposal.)

Despite having been informed that EWI was facing financial stress as a result of increased labor costs and was considering moving business out of the jurisdiction of the CBA, and despite being specifically aware that EWI had established a North Carolina non-union operation, the MRCC never objected to EWI's operating outside Michigan, never grieved EWI's decision to open up a non-union shop in North Carolina and never filed an unfair labor practice charge.  The MRCC did however file a grievance on December 14, 2009 regarding EWI's decision to change the pay rate for a certain category of Michigan supervisors from a Foreman rate to a Journeyman rate.  (Def.'s Mot. Ex. 1, Lockard Aff. ¶ 11.)  That grievance went to arbitration and resulted in a lengthy opinion by the arbitration panel.

**C.**     **Efforts to Resolve Issues Related to Scope of the Special Audit**

Although the MRCC never grieved EWI's business decision to perform work outside the jurisdiction of the CBA, and specifically to open a non-union shop in North Carolina, Plaintiffs' February 8, 2010 special audit request sought "work orders" and North Carolina payroll records in an effort to determine why there had been a significant decrease in 2009 in the hours reported to have been worked at EWI's Livonia facility.  Plaintiffs' counsel and counsel for EWI had lengthy

communications regarding the scope of the February 8, 2010 special audit request. (Def.'s Mot. Ex. 24, Email Correspondence, April 28, 2010 through October 7, 2010.) With respect to its North Carolina payroll and wage related records, EWI took the position that "any work done outside the geographic jurisdiction of the collective bargaining agreement is not covered by that agreement, and thus no contributions for that work would be due." (Def.'s Mot. Ex. 24, 4, April 28, 2010 email from E. Hammond to D. Selwocki.) EWI reiterated its view that "there is no contribution requirement for those employees working outside the geographical jurisdiction of the bargaining agreement, and therefore no corresponding right for an audit." *Id.*

In response, Plaintiffs counsel appeared to temporarily back off of its request for specific North Carolina payroll records but reiterated its demand for "all work orders" for 2007-2009:

> I understand that your correspondence below is to be interpreted and stating that if the work was completed at a facility outside of the jurisdiction, then the actual payroll for that work will not be provided. However, in order to even address your position regarding this issue, we need to see the total picture and understand where the hours are at or have gone for which contributions are required. We believe seeing the total work orders/contracts and the corresponding hours will be a means of attempting to address that issue. If the work was shipped out or transferred, then we apparently, based on your statements below, have to address that issue separately.

Def.'s Mot. Ex. 24, 4, May 10 2010 email from D. Selwocki to E. Hammond.

EWI's counsel responded that EWI was unwilling to produce the requested "work orders" for several reasons: (1) they had never been requested in connection with any previous audit and did not reflect hours worked or contributions and therefore were irrelevant to an audit; (2) the work orders contained confidential business information; (3) they numbered in the tens of thousands for the years in question and would be burdensome to produce; and (4) the "work orders" did not fall within any reasonable definition of "payroll and related records" and therefore were outside the auditor's authority under the Plan and Trust documents. (Def.'s Mot. Ex. 24, 2, May 20, 2010 email

from E. Hammond to D. Selwocki.) By way of example, EWI provided Plaintiffs' counsel with samples of redacted work orders, documenting that they did not contain either a notation as to hours worked or any identifying information regarding where the requested work was performed or by whom. (Def.'s Mot. Ex. 25, Redacted Work Orders.)

In response, Plaintiffs' counsel reiterated its request for the "work orders," to determine if the Funds "are receiving all hours for covered work." (Def.'s Mot. Ex. 25, 9, July 23, 2010 email from D. Selwocki to E. Hammond.) EWI's counsel responded that because only work done in Michigan was "covered work" under the CBA, and because it was undisputed that Plaintiffs had received all payroll and wage related documents for all work performed in Michigan, any additional documents were irrelevant to the requested audit. EWI's counsel further explained: "As to "what work EWI is obtaining, and who is doing that work," that seems like a much different issue than auditing whether EWI is contributing for work it performs in southeastern Michigan counties named in the CBA . . . and therefore is not the proper basis for a Fund audit." (Def.'s Mot. Ex. 25, 8, July 23, 2010 email from E. Hammond to D. Selwocki.)

Plaintiffs' counsel responded as follows:

We are missing hours for work we are presuming that EWI is doing. The hours are down. I believe this to be an undisputed fact. Is the work being sub. [sic] out? Is it being done off the books? Is it being done through a related entity (i.e. alter ego), or is it being shipped out? Maybe the work is gone. Anyway, I think we have made it clear that we need records to make sure we are getting all contributions due. . . . Where did the hours go?

(Def.'s Mot. Ex. 25, 8, July 25, 2010 email from D. Selwocki to E. Hammond.)

EWI's counsel responded that he could likely obtain an affidavit from his client, or provide individuals with knowledge for deposition, to demonstrate that work is not being performed by covered members of the MRCC in North Carolina, or by any other controlled group or alter ego

Michigan entity, and that no work is being subcontracted out to a Michigan subcontractor.[2] EWI's counsel reiterated that the "crux" of the issue appeared to be the definition of "covered work," a proper subject for bargaining between the Union and EWI, that the current CBA did not cover any work outside of Michigan, that EWI had provided all payroll and wage related records regarding all work performed in Michigan, and would do so again in response to the special audit request. (Def.'s Mot. Ex. 25, 7, July 27, 2010 email from E. Hammond to D. Selwocki.)  Counsel continued to communicate through the months of August and October, Plaintiffs insisting that they had a right to learn "where the hours went," and EWI insisting that regardless of "where the hours went,"  work performed outside the jurisdiction of the CBA was not "covered work" and could not possibly create unfunded liabilities under the CBA.  EWI continued to maintain that Plaintiffs had all of the information that was relevant to an audit of any work performed by EWI that was covered under the CBA.  Counsel ultimately were unable to reach a resolution and this lawsuit followed.

## II.    STANDARD OF REVIEW

### A.    Federal Rule of Civil Procedure 56

Pursuant to Federal Rule of Civil Procedure 56, a party against whom a claim, counterclaim, or cross-claim is asserted may "at any time, move with or without supporting affidavits, for a summary judgment in the party's favor as to all or any part thereof." Fed. R. Civ. P. 56(b). Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact as to the existence of an essential element of the nonmoving party's case on

---

[2] At the hearing on this matter, EWI's counsel stated that Plaintiffs never followed up on this offer, never sought such testimony, either by way of affidavit or deposition.  Plaintiffs do not appear to dispute that they never attempted to verify or confirm their suspicions through the testimony of any EWI employees.  To be sure, they have provided no such testimony in support of their motion for summary judgment.

which the nonmoving party would bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id*. at 323; *See also Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987).

A fact is "material" for purposes of a motion for summary judgment where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (quoting Black's Law Dictionary 881 (6th ed. 1979)) (citations omitted). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Conversely, where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for trial. *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993). In making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party. *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322-23. The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. Fed. R. Civ. P. 56(e).

The rule requires the non-moving party to introduce "evidence of evidentiary quality" demonstrating the existence of a material fact. *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997); *see also Anderson*, 477 U.S. at 252 (holding that the non-moving party must produce more than a scintilla of evidence to survive summary judgment). The non-moving party must do more than create "some metaphysical doubt" as to the material facts:

> Once the moving party has met its burden of production, the nonmoving party then must go beyond the pleadings and by affidavits, or by "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." [*Celotex Corp. v. Catrett*, 477 U.S. 317], 324 [1986]. Thus, the nonmoving party must do more than show that there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). It must present significant probative evidence in support of its complaint to defeat the motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986).

*Moore v. Phillip Morris Cos., Inc.*, 8 F.3d 335, 339-40 (6th Cir. 1993). The non-moving party "may not 'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir.1989)). It is not the duty of the court "to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street*, 886 F.2d at 1479-80.

### B. Federal Rule of Civil Procedure 15

Federal Rule of Civil Procedure 15(a) states that after a responsive pleading is filed, a complaint may be amended only by leave of the court, and that "leave shall be freely given when justice so requires." However, "[a] motion to amend a complaint should be denied if the amendment is brought in bad faith, for dilatory purposes, results in undue delay or prejudice to the opposing

party, or would be futile." *Crawford v. Roane*, 53 F.3d 750, 753 (6th Cir.1995); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962). "Delay alone will ordinarily not justify the denial of leave to amend; however, delay will at some point become 'undue,' 'placing an unwarranted burden on the court,' or 'prejudicial,' 'placing an unfair burden on the opposing party.'" *Commercial Money Center, Inc. v. Illinois Union Ins. Co.*, 508 F.3d 327, 347 (6th Cir. 2007) (quoting *Morse v. McWhorter*, 290 F.3d 795, 800 (6th Cir. 2002)). Ultimately, the determination of whether the motion to amend is to be granted is left to the sound discretion of the trial court. *Foman*, 371 U.S. at 182.

"[A] motion to amend that is filed after the expiration of the amendment deadline set in the case management order must satisfy the stricter requirements of Rule 16(b) as well as the requirements of Rule 15(a). 'Once the scheduling order's deadline passes, a plaintiff first must show good cause under Rule 16(b) for failure earlier to seek leave to amend before a court will consider whether amendment is proper under Rule 15(a).'" *Edwards v. Grand Rapids City. College*, No. 09-1067, 2010 WL 2163823, at *2 (W.D. Mich. May 27, 2011) (quoting *Leary v. Daeschner*, 349 F.3d 888, 909 (6th Cir. 2003)). A court's case management order is not "a meaningless piece of paper that a party may ignore at his whim," and a party seeking relief from a case management order must show good cause for failing to act within the time frame set forth in the order. *Id.*

## III.   ANALYSIS

It is clear that contributions to the Plaintiff Benefit Funds are only required to be made on work that is covered under the CBA. It is likewise clear that work that is not performed within the geographical boundaries of the CBA is not covered under the CBA and that such work cannot possibly create unfunded liabilities because no contributions can possibly be due under the CBA for

work performed outside the eight-county area defined in the CBA. Plaintiffs assert that "Plaintiffs may be entitled to fringe benefits for work performed outside the jurisdiction, if Defendant intended to evade the Collective Bargaining Agreement." (Dkt. No. 35, Pl.'s Mot. 11.) However, Plaintiffs have not cited one provision of the Trust or Plan documents, or one case, that supports this blanket proposition. While Plaintiffs obliquely suggest that EWI may be operating an alter-ego company or engaging in double-breasting within the jurisdiction of the CBA, conduct that conceivably could result in a violation of the terms of the CBA, no such claims are made against EWI in the instant Complaint, which merely seeks to enforce audit rights under the CBA.

A. **Plaintiffs are Not Entitled to Audit Records for Employees Working Beyond the Geographical Jurisdiction of the CBA**

The Plaintiffs' right to audit the books and records of EWI to verify that required contributions have been made is not without limits. *Central States, Southeast and Southwest Areas Pension Fund, et al v. Central Transport, Inc.*, 472 U.S. 559, 571 (1985). Importantly, the authority to audit "is limited . . . by the terms of the parties' agreements." *Id*. at 565. "[W]here the plan documents limit[] the scope of the trustees' duties to eligible employees and beneficiaries, the scope of the audit [cannot] not be expanded to include non-eligible employees." *Cement Masons Local 527 v. Buffa Concrete Contractors, Inc.*, No. 10-cv-1971, 2011 WL 719205, at *2 (E.D. Mo. Feb. 23, 2011) (distinguishing *Central States* and noting that the plan documents control).

1. **The Holding of *Central States* Does Not Support Plaintiffs' Expanded Audit Request**

Plaintiffs rely on *Central States, supra*, in support of their argument that they are permitted to inspect all records they deem relevant in connection with their administration of the Plaintiff Benefit Funds. In *Central States*, the trustees of a multi-employer benefit plan sought to inspect the

payroll, tax and personnel records of all Central State employees, including the 60% of employees

whom the employer claimed were not covered by the governing benefit plans based upon their job

descriptions and job status. 472 U.S. at 563. The trustees argued that they should be permitted to

examine the records of all employees, including those self-described by Central Transport as non-

covered, "in order to determine whether the duties and status of each of its employees ha[d] been

accurately reported by Central Transport." *Id*. at 564.

The Supreme Court began its analysis with an examination of the trust documents, which

granted the trustees very broad rights to examine the "pertinent records of each Employer . . .

whenever such examination is deemed necessary or advisable by the Trustees in connection with

the proper administration of the trust." *Id*. at 566. The Court concluded that permitting

examination of the payroll records of all employees would advance the goal of "verifying that the

employer has accurately determined the class of covered employees." *Id*. at 567. Quoting from the

American Institute of Certified Public Accountants' Statement of Auditing Standards, the Court

further observed that standard auditing procedures often included reference to a broader universe

than the selected documents themselves:

> The auditor should determine that the population from which he draws the sample
> is appropriate for the specific audit objective. *For example, an auditor would not be
> able to detect understatements of an account due to omitted items by sampling the
> recorded items. An appropriate sampling plan for detecting such understatements
> would involve selecting from a source in which the omitted items are included.*

472 U.S. at 567 (emphasis in original). The Court observed that the plans had a substantial interest

in verifying the employer's determination of participant status because:

> [A]n employer's failure to report all those who perform bargaining unit work may
> prevent the plans from notifying participants and beneficiaries of their entitlements
> and obligations under the plans and may create unfunded liabilities chargeable
> against the plans [because under ERISA an employee who is eligible for coverage

18

under the plan must be awarded benefits regardless of whether the employer is required to or has made or defaulted on his required contributions].

*Id.* at 566-67. Thus, in *Central States*, the entire universe of employees whose records the trustees sought to review had the potential, depending on their job description and status, to be covered under the plans. Accordingly, allowing the auditors to examine the "payroll, tax and personnel" records of all employees, including those who Central States had determined were "not covered," had the potential to unearth unidentified plan participants who would have valid claims against the funds for benefits but for Central States mistaken classification of "covered" employees.

By contrast, in the instant case, under the CBA, EWI is not required to contribute to the Plaintiff Benefit Plans on behalf of an EWI employee who performs work outside the geographic jurisdiction of the CBA. Likewise, such an employee will never be entitled to plan benefits for such work. Therefore, failing to identify the work performed by such employees has no potential to create unfunded liabilities. Likely this is why Plaintiffs have never before requested records from an employer for employees working outside the State of Michigan. (Def.'s Mot. Ex. 5, Davis Dep. 33.) Accordingly, there is no basis for Plaintiffs to request an audit of records relating to work performed outside the eight-county area subject to the CBA. Unlike the universe of records requested by the auditors in *Central States*, any one of which had the potential to result in a reclassification of an employee as a plan participant based upon their job duties and status, the universe of records sought in the instant case are not capable of yielding any undisclosed covered work because, as a matter of law, only work performed in Michigan (indeed in the eight-county jurisdiction of the CBA) can be covered. Plaintiffs do not dispute that they have received all relevant records for all of EWI's Michigan employees and for all work performed by EWI in the State of Michigan. Plaintiffs' alleged fear that EWI's decreased hours must be the result of EWI

"subcontracting work in Michigan" or utilizing an "alter ego" company to perform work in Michigan, cannot be addressed through a request to audit records relating to work that concededly is not covered under the CBA. Notably, the decrease in EWI's hours over the course of the year's in question is not inconsistent with, and indeed is less than, the total decrease in hours across a spectrum of related companies over that same period of time. (Def.'s Repl Ex. 2.)

### 2. Plaintiffs are Not Entitled to Audit North Carolina Payroll and Wage Related Records

In the instant case, Plaintiffs appear to have backed off of their request for the payroll and wage related of employees at EWI's North Carolina facility. In any event, the language of the CBA is clear that benefits are required to be paid "for all hours worked by each Employee covered by the Agreement." (Def.'s Mot. Ex. 2, CBA, Article V ¶ B.) Covered employees are "carpenters," as defined in the craft jurisdiction language, employed "in the geographical area coming within the jurisdiction of the Union [Wayne, Oakland, Macomb, Sanilac, St. Clair, Monroe, Washtenaw and Livingston Counties] . . . ." (*Id.* Article I ¶ A.) The Pension Plan Trust Agreement further supports this conclusion, defining the term union to mean "[t]he Carpenters District Council of Detroit, Wayne, Oakland, Macomb, Monroe, St. Clair, Sanilac and portions of Livingston Counties . . . ." (Def.'s Mot. Ex. 9, Art. I § 1.) Plaintiffs admit that it is permissible for EWI to have facilities outside Michigan where they perform carpentry work and that there is no MRCC jurisdiction over facilities of its members outside the State of Michigan. (Def.'s Mot. Ex. 3, July 27, 2011 Deposition of Milford R. Reynolds, 77:10-78:3; 80:5-13.)

Employees of EWI who perform work outside the geographical jurisdiction of the CBA are not covered by the CBA, EWI is not required to contribute to the Plaintiff Benefit Funds on their behalf and the North Carolina records relating to such employees would be beyond the scope of the

Plaintiffs' duties to "eligible employees and beneficiaries." *See Michigan Glass and Glazing Industry Defined Contribution Pension Plan v. CAM Glass, Inc.*, No. 06-12917, 2008 WL 506350, at *14-15 (E.D. Mich. Feb. 22, 2008) (holding that similar language in a collective bargaining agreement precluded plaintiffs' claim for contributions on work performed outside the specific counties listed in that agreement). *See also Demolition Workers Union, Local 95 v. Mackroyce Contracting Corp.*, No. 97-4094, 2000 WL 297244, at * 4 (S.D.N.Y. March 22, 2000) (in action under ERISA to recover unpaid contributions, clear terms of the collective bargaining agreement that defined the jurisdiction of the CBA to New York, New Jersey and Connecticut, required contributions only on hours worked in those states).

Because employees who perform work outside the jurisdiction of the CBA are not covered by the CBA, EWI is not required to contribute to the Plaintiff Benefit Funds on behalf of such work and there is no basis for such employees ever to claim a right to benefits from the Plaintiff Funds on such work. Therefore, Plaintiffs have no right to audit North Carolina, or other EWI records relating to work performed outside the jurisdiction of the CBA by non-covered employees. As stated above, EWI has agreed to make contributions to the Plaintiff Benefit Funds on behalf of employees covered by the CBA. North Carolina, or other out-of-jurisdiction employees, are not eligible employees under the CBA and no audit rights exist as to their payroll and wage related records. Plaintiffs' duties under the Plan and Trust documents are to covered employees and their beneficiaries. Plaintiffs owe no duty to employees who could never, as a matter of law, be entitled to benefits under the Plans. Plaintiffs have no risk of unfunded liabilities arising out of their work. Unlike the situation presented in *Central States*, there is no potential in the instant case that covered employees may be discovered through an examination of North Carolina payroll and wage related

records. Plaintiffs have failed to articulate any legal basis for the Court to conclude otherwise. Plaintiffs simply have no right to audit records of employees as to whom no contributions are or could be required as a matter of law. *See Northwestern Ohio Plumber & Pipefitters Local 50 Employee Benefits Plans v. Helm & Assoc., Inc.*, No. 06-1395, 2007 WL 2571964, at *4 (N.D. Ohio Aug. 31, 2007) (refusing to allow plaintiff funds "carte blanche" discovery of defendant's records, finding that the only relevant audit was as to eligible employees because trustees owed no duty to employees not covered by the CBA and requiring defendant to submit to an audit only of eligible employees under the trust agreement).

Plaintiffs also complain that EWI's CEO, Mr. Silvio, stated that he was educating himself about the law on ERISA withdrawal liability and that he intended to withdraw the maximum amount of hours he could without incurring liability. Even if true, this is simply Mr. Silvio's statement about his understanding of the applicable law; Plaintiffs offer no explanation of how such a statement, even if made, supports Plaintiffs' request to examine records pertaining to work that has no potential to create unfunded liabilities under the current CBA. Again, these allegations may be relevant to an action against EWI for withdrawal liability under ERISA, but this is not an action under ERISA.[3]

---

[3] 29 U.S.C. § 1381 provides: "If an employer withdraws from a multiemployer plan in a complete or partial withdrawal, then the employer is liable to the plan in the amount determined under this part to be the withdrawal liability." 29 U.S.C. § 1385 provides that there is a partial withdrawal on the part of an employer "from a plan on the last day of a plan year if for such plan year – (1) there is a 70-percent contribution decline, or (2) there is a partial cessation of the employer's contribution obligation."

**B. Even Assuming that Certain Documents Relating to EWI Employees Performing Work Outside the Geographic Jurisdiction of the CBA Could be Shown to Have the Potential to Reveal Unpaid Contributions, Plaintiffs Have Not Established the Relevance of the Requested Work Orders to Such an Endeavor**

Interestingly, in their response to EWI's motion to dismiss, Plaintiffs state that the issue of whether Plaintiffs are entitled to collect fringes for work performed in North Carolina is not before the Court. (Dkt. No. 38, 1.) Plaintiffs assert that the "sole issue is whether Plaintiffs are entitled to audit records which can explain Defendant's sharp decrease in hours reported." *Id*. To this end, Plaintiffs seek EWI "work orders" from all of EWI's facilities.

As an initial matter, the Court rejects Plaintiffs' claim that they only learned of the sharp decrease in EWI's hours after the November, 2009 audit was complete. *Id*. at 3. Plaintiffs' own document demonstrates that a significant decrease in hours occurred in March, 2009 and that hours continued to decline rapidly through the months of April, May, June, July and August. (Pl.'s Resp. Ex. B.) Plaintiffs received "hours worked" reports on a monthly basis. (Dkt. No. 43, Ex. 1, Monthly Contribution Reports for EWI.) Moreover, Richard Davis, the then newly-elected President of the MRCC, met with EWI's CEO Mr. Silvio in July or August of 2009, specifically to discuss the souring relationship with EWI and the decrease in hours. All of this of course occurred before the standard October, 2009 Audit Request Letter was sent to EWI. Plaintiffs' claim that they only learned of the decrease in EWI's reported hours after the November audit was complete is simply not credible.

More importantly, however, Plaintiffs have not offered any explanation as to the basic relevance of EWI's "work orders" to its declared audit goal of discovering covered work, for which it suggests EWI may have failed to contribute. EWI has provided Plaintiffs with samples of the

requested work orders and it is not disputed that they do not contain any information regarding who performed the work, where the work was performed and clearly do not contain any information related to wages or payroll. (Def.'s Mot. Ex. 25.) Plaintiffs have never clearly articulated what information they hope to glean from the requested work orders, stating only that they should have the right to determine "where did the hours go?" (Pl.'s Reply 3.) Even if the documents establish that EWI had nearly the same number of work orders throughout the relevant time frame, so that it could be assumed that some of the work previously done in Livonia must be being done somewhere else, these documents contain no information regarding "where" the hours went.

### C. Even Assuming that Plaintiffs Could Establish the Relevance of the Work Orders, the Work Orders are Not "Payroll or Wage Related Records" and thus are Not Subject to Audit Under the Plan and Trust Documents

The Court concludes that, even if relevant, EWI's work orders do not constitute payroll or wage related records under the terms of the parties' agreements. The CBA incorporates by reference the trust agreements and related rules, regulations, policies and procedures. (Def.'s Mot. Ex. 2, 23-24.) Those agreements permit examination of "payroll and related records." (Def.'s Mot. Ex. 9, Pension Plan Trust Agreement 13; Ex. 12, Joint Apprenticeship & Training Trust Agreement 10.) It is clear from these trust documents that the right to examine records in connection with an audit for the purpose of determining the sufficiency of an employer's contributions is limited to payroll and wage related records, i.e. records that relate in some way to the employer's obligation to pay its employees.

Plaintiffs rely on the language of the JDC Statement of Procedures, which requires an employer to make available to the Funds' auditors "any and all employee wage and related records," and permits examination of "pertinent payroll or any other relevant books and records . . . ." (Pl.'s

Mot. Ex. J.)  The parties dispute whether "other relevant books and records" is qualified by the prior references to payroll and wage related records and EWI maintains that the JDC is not applicable at all because EWI is not delinquent.  Putting aside any arguments over syntax and delinquency, the controlling fact is that the JDC Statement of Procedures expressly provides that it "supplements the Plan, Trust or any other governing documents of each Fund and is not intended to amend or restate same.  If any portion of th[] Statement conflicts with that of the applicable governing documents, the provisions of the respective governing documents shall control."  (Def.'s Mot. Ex. 13, Preamble.)  Because the "governing documents" clearly express an intent to limit audit rights to "payroll and wage related records," the Court concludes that any language of the JDC Policy that conflicts with that intent, or seeks to expand the scope of records subject to audit, is not controlling.

Given that Plaintiffs are limited, under the governing Plan and Trust documents, to seeking payroll and wage related records in fulfilling their obligation to ensure that all required contributions are being made to the Plaintiff Benefit Funds, the Court concludes that they are not entitled to review EWI's "work orders" for all of its facilities.  As discussed above, the EWI work orders contain absolutely no information relating to employees who performed the work, wages paid for that work, where the work was performed or any other information that can remotely be considered related to EWI's payroll and wages.  Plaintiffs don't even really dispute this.  They just claim that somehow they will be able to "match up" the work orders with some other unidentified information to determine who worked where, when and for how much money.  Even *Central States*, on which Plaintiffs so heavily rely to support their expansive request, involved only "payroll, wage and personnel records."

The Court concludes that Plaintiffs have failed to create a genuine issue of fact to defeat EWI's contention that these work orders are not payroll or wage related. Accordingly, the Court denies Plaintiffs' request to examine EWI's "work orders" for all of its facilities.[4]

### D.     The Court Denies Plaintiffs' Motion for Leave to Amend

Plaintiffs seek to amend their Complaint, specifically their prayer for relief, to track the language of the JDC Policy and permit them to examine "any and all employee wage and related records, pertinent payroll records, or any other relevant books and records." (Dkt. No. 34, Pl.'s Mot. to Amend 2.) Because the Court concludes that the language of the Plan and Trust documents, which limits Plaintiffs' audit exam rights to payroll and wage related records, conflicts with and would trump the JDC Policy language, and because the Court concludes that Plaintiffs are not entitled to examine either out-of-jurisdiction payroll and wage related records or EWI's "work orders," the Court denies Plaintiffs' motion to amend as futile.

Additionally, and equally fatal to Plaintiffs' motion to amend, however, is that Plaintiffs' request to file their "nominal amendment" comes long after the scheduling order deadline for filing amendments to the Complaint. "[A] motion to amend that is filed after the expiration of the amendment deadline set in the case management order must satisfy the stricter requirements of Rule 16(b) as well as the requirements of Rule 15(a). 'Once the scheduling order's deadline passes, a plaintiff first must show good cause under Rule 16(b) for failure earlier to seek leave to amend before a court will consider whether amendment is proper under Rule 15(a).'" *Edwards*, 2010 WL

---

[4] EWI also argues that the February 8, 2010 special audit request was filed for an improper purpose, either in retaliation for the journeyman/foreman wage dispute or to advance the MRCC's labor agenda and not for the benefit of plan participants and beneficiaries. The Court need not reach this issue given its resolution of the parties' motions on other grounds.

2163823, at *2.  Plaintiffs have offered absolutely no justification for waiting until this late stage of the litigation to file their motion to amend.  Accordingly, Plaintiffs' motion to amend is denied.

## IV.	CONCLUSION

The CBA does not cover any EWI employees when performing work outside the jurisdiction of the CBA and EWI has not agreed to make contributions on their behalf.  Therefore, Plaintiffs owe no duty to such employees and have no risk of unfunded liability arising out of their work, which has no possibility of being covered under the CBA.  Because as a matter of law such employees cannot be owed benefits from the Plaintiff Benefit Funds for their uncovered work, Plaintiffs have no authority to audit records pertaining to the work of such employees.  Plaintiffs have offered no legal support for their contention that work that EWI may be performing outside the jurisdiction of the CBA may nonetheless be covered by that agreement, triggering EWI's obligation under the CBA to contribute to the Plaintiff Funds.  Plaintiffs have never directed their requests in this matter toward discovering whether EWI has parallel shops, double breasted operations or alter egos operating within the jurisdiction of the CBA or even within the State of Michigan.  Such issues are not raised in Plaintiffs' Complaint, have not been the subject of discovery and are not properly before this Court.

Even assuming Plaintiffs had been able to articulate some legal basis for their claim that admittedly non-covered work was nonetheless "covered" under the CBA, Plaintiffs have failed to establish that the "work orders" they request contain the type of information that would yield answers to Plaintiffs' question as to "where the work went."  Finally, such "work orders" do not fall within the definition of payroll and wage related records as defined in the governing Plan and Trust documents.

Accordingly, the Court DENIES Plaintiffs' motion for summary judgment (Dkt. No. 35),

GRANTS Defendant's motion for summary judgment (Dkt. No. 36) and DENIES Plaintiffs' motion

to file an amendment to the Complaint (Dkt. No. 34).

IT IS SO ORDERED.


S/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  April 18, 2012

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on
April 18, 2012.


S/Denise Goodine
Case Manager